COMFORT TRANE AIR CONDITION-
ING COMPANY et al.,
Plaintiffs-Appellants,

v.

The TRANE COMPANY et al.,
Defendants-Appellees.

The TRANE COMPANY,
Defendant-Third-Party
Plaintiff-Cross-Appellant,

v.

COMFORT TRANE AIR CONDITIONING
COMPANY, Comfort Trane Service
Company, Inc., Haswell Enterprises, Ltd.
and Home Center Corporation, Third-
Party Defendants-Cross-Appellees.

No. 78–1427.

United States Court of Appeals,
Fifth Circuit.

April 16, 1979.

Warren O. Wheeler, Atlanta, Ga., for Comfort Trane Air Conditioning Co., Comfort Trane Service Co., Inc. & Haswell Enterprises, Ltd.

Trammell Newton, Trammell E. Vickery, Atlanta, Ga., for The Trane Co. & Peachtree Trane Air Conditioning Co.

Robert D. Feagin, Atlanta, Ga., for Howell Adams & Associates, Inc.

Hansell, Post, Brandon & Dorsey, Herbert P. Schlanger, Atlanta, Ga., for defendants-appellees.

Before GOLDBERG, SIMPSON and CLARK, Circuit Judges.

SIMPSON, Circuit Judge:

The district court below directed a verdict against plaintiffs on their § 1 Sherman Act antitrust claim and directed a verdict against defendant The Trane Company on its counterclaim for a deficiency judgment. Previously it had granted partial summary judgment against plaintiffs on their several state law tort claims.

Three major issues are raised on this appeal. First, as to the antitrust claim, the question is whether plaintiffs adduced substantial evidence in opposition to the directed verdict motion from which reasonable and fair-minded jurors might have concluded that in retaliation for plaintiffs' refusal to fix prices, divide the market geographically, and limit competition, defendants conspired to terminate plaintiffs' businesses by: (a) causing a bank to set off against plaintiffs' checking account; (b) attempting to have plaintiffs' landlord padlock their business premises; (c) trying to hire plaintiffs' employees; and (d) foreclosing on a security interest while a competitor enjoyed different credit terms. Second, as to the counterclaim, the issue is whether the district court properly directed a verdict against defendant The Trane Company on its counterclaim even though it improperly found that the question of commercial reasonableness of Trane's liquidation sale was one of law for the court, and not a question of fact for the jury. Finally, as to plaintiffs' state law tort claims, we must determine whether plaintiffs satisfied the burden imposed upon them by Fed.R.Civ.P. 56(e).

## I. DIRECTED VERDICT—SHERMAN ACT CLAIM

### A. STATEMENT OF FACTS

#### 1. The Parties

Plaintiffs in this action are three business enterprises owned and controlled by Michael William Haswell. Comfort Trane Air Conditioning Company and Comfort Trane Service Company, Incorporated are wholly owned subsidiaries of Haswell Enterprises, Limited. In turn, Michael Haswell owns all

the outstanding shares of Haswell Enterprises, Limited. In this opinion, these plaintiffs will be referred to collectively as "Comfort" or "Haswell" unless the context indicates otherwise.

Defendant The Trane Company ("Trane") is a national manufacturer of air conditioning equipment. During the relevant time period, 1971 through 1974, Trane operated through and was organized into several divisions. The Consumer Products Division ("CPD") is one such division.

These divisions have a national distribution network consisting of sales agents and independent dealer-franchisees. Sales agents consult with and assist dealers, earning commissions on sale of Trane equipment. Defendant, Howell Adams and Associates, Incorporated, is a Trane sales agent with the responsibility for virtually the entire state of Georgia. Defendant Peachtree Trane Air Conditioning Company ("Peachtree") is now an independent Trane dealer, also referred to as a Trane Comfort Corps dealer.[1] For most of the relevant time period, however, it was a wholly owned subsidiary of Trane. Comfort was also a member of the Trane Comfort Corps. Both Peachtree and Comfort sold, installed, and serviced air conditioning systems.

### 2. The Parties' Respective Claims

Plaintiffs instituted this action on October 10, 1974. Several causes of action were alleged: violations of the Sherman and Robinson-Patman Acts as well as numerous state law tort claims. Plaintiffs sought damages for an alleged conspiracy among the defendants to restrain plaintiffs' marketing of air conditioning equipment and services, and to terminate plaintiffs' businesses, for anticompetitive motives, through a foreclosure action. Defendant Trane counterclaimed for the debt allegedly owed by Comfort under the terms of a security agreement in default.[2]

In response to defendants' motions for summary judgment, the district court entered an order granting partial summary judgment. The court denied defendants' summary judgment motions with respect to plaintiffs' § 1 Sherman Act claim, but granted summary judgment against plaintiffs on their claims under section 2 of the Sherman Act, the Robinson-Patman Act and state tort law. Plaintiffs appeal the summary judgment entered on the state law tort claim.

Shortly before trial defendants moved to strike certain components of plaintiffs' damage claim.[3] Plaintiffs appeal the district court's granting of defendants' motion. Following a two weeks' trial before a jury, the court directed a verdict against plaintiffs on their § 1 Sherman Act claim, after both sides rested. Because we find the district court correctly directed a verdict against plaintiffs on the antitrust liability issue,[4] we need not and do not address the granting of the defendant's pre-trial motion, nor do we express any opinion as to the merits of plaintiffs' contentions. Further, we need not consider defendants' argument that plaintiffs failed to introduce sufficient evidence from which a jury could have determined the extent of damages which plaintiffs allegedly suffered.

On October 20, 1977, the court directed a verdict against plaintiffs on their Sherman Act claim and against defendant Trane on its counterclaim for the deficiency remaining after foreclosure and liquidation. Cross appeals have been timely filed from these directed verdicts.

Inasmuch as we review the district court's directed verdicts under the teach-

---

1. Trane Comfort Corps is the name given to Trane's CPD system of independent dealers who are franchised to use the Trane name.

2. Subsequently, Michael Haswell was joined by Trane as a defendant to the counterclaim. On this appeal, however, the parties have stipulated, pursuant to Fed.R.App.P. 42(b), to the dismissal of Michael Haswell as a party to defend-

ant Trane's appeal of the district court's directed verdict on the counterclaim.

3. Plaintiffs sought to recover as antitrust damages the loss they allegedly suffered by virtue of the manner in which Trane conducted the liquidation of Comfort assets after foreclosure.

4. See discussion in Part I, Section B, *infra*.

ings of *Boeing Co. v. Shipman*, 411 F.2d 365, 374–76 (5th Cir. 1969) (en banc), the evidence produced at trial must be scrutinized closely. We do so below in light of the parties' respective contentions on appeal.

### 3. *Evidence Adduced at Trial*

Plaintiffs maintain that the evidence adduced was sufficient to raise a reasonable inference that plaintiffs' businesses were impaired and then terminated: (a) to retaliate against plaintiffs for excessive competition; (b) to convey a message to other Trane dealers; and (c) to protect Trane's then subsidiary, Peachtree. Defendants maintain that the district court properly directed a verdict against plaintiffs because there was no substantial evidence showing that anticompetitive considerations materially contributed to plaintiffs' business failures and because defendants produced overwhelming evidence that whatever decisions any of them made were prompted solely by legitimate business considerations.

#### a. *Alleged Anticompetitive Motive*

As to defendants' alleged anticompetitive motive, plaintiffs argue that defendant successfully sought to terminate Comfort's businesses because Comfort: (1) refused to engage in a price-fixing scheme; (2) refused to divide the Atlanta market geographically and participate in a common telephone solicitation plan; and (3) continued to engage in excessive competition in both the residential add-on and commercial air conditioning markets.[5]

#### (1) *Alleged Price-fixing Scheme*

It is undisputed that a meeting occurred in March 1973 at Peachtree. This meeting was called by McCready, then CPD manager for Howell Adams & Associates. Franke, then President of Peachtree and now its owner, testified that the purpose of this meeting was to "go over" price sheet formats McCready received from Trane's

California operations. These price sheets were to be used "to recreate a consistence in the salesmen offering to the customer the same list of goods and services." Record, Vol. 14, at 33. Franke further testified that only a format for prices, and not specific prices, was discussed. The parties did agree to formulate prices and furnish them to McCready. Franke gave McCready a written list of prices the day after the meeting, but never received nor saw a Comfort price list until the trial of this case.

Haswell testified that, at McCready's suggestion, the parties discussed and agreed upon specific prices to be used by both companies. Rutherford, formerly residential add-on sales manager for Peachtree, testified on deposition that this meeting involved specific discussions to eliminate price competition. In Rutherford's words, "We had to have the same price for the same system. And, too, we had to sell the same system." Rutherford Deposition, at 21. Rutherford thought that an agreement had been reached insuring uniform prices for add-on units. All of Rutherford's testimony is suspect since he was fired by Franke. Furthermore, Haswell contradicted Rutherford's testimony: Rutherford claims he attended this meeting, whereas Haswell recalled Rutherford being present for only five or ten minutes.

*Without dispute, no officer or employee of Trane was present at this meeting.*

#### (2) *Alleged Geographic Market Division Common Telephone Solicitation Plan*

In the Spring of 1973, Roth, Vice-President of Trane's CPD, visited Haswell. According to Haswell, Roth "suggested" that Peachtree and Comfort coordinate efforts so they "would not bump heads." More specifically, Haswell testified that Roth suggested coordination of telephone solicitation and a geographical split of the Atlanta market in which Peachtree and Comfort operated. Roth claims that during this

---

**5.** There are two major air conditioning equipment markets: sales and service. The air conditioning sales market is comprised of several sub-markets: residential new construction

(builder market); residential add-on (existing residences), small commercial, and large commercial.

meeting he and Haswell discussed Haswell's interest in the Home Comfort Center marketing concept [6] and Comfort's need for a professional add-on sales manager.

In the Fall of 1973 a meeting was held at Peachtree. Thomas Adams, brother of Howell Adams and CPD manager after McCready, called this meeting. In attendance were representatives from Howell Adams & Associates (Thomas Adams, Vaughn Vernado), Peachtree (Franke, Rutherford), and Comfort (Haswell, Johnson, Gordon). *No one representing Trane was present.*

According to Johnson, Comfort's sales manager, the subject of the meeting was a joint telephone solicitation room. Johnson testified that Rutherford left the meeting at one point after stating that he did not like the idea of a joint telephone room, and that he could not trust Comfort because "we had not lived up to our agreement with the—maintaining prices . . . ." Record, Vol. 10, at 538. Johnson also testified that Vernado (Howell Adams & Associates sales consultant for CPD) said he (Vernado) "wanted us to sing off the same sheet of music. And that meant to me [Johnson] that he wanted our prices to be exactly the same as Peachtree's prices except that we were not doing the duct vacuuming, for instance, and our prices could be that much different." *Id.* at 543.

Thomas Adams testified that he called the meeting for the purpose of exploring the possibility of establishing a corporation to handle telephone solicitation of sales for Peachtree and Comfort. Adams thought this combined effort would solve a problem about which he had received several complaints from the public: receipt of several telephone calls, back-to-back, in which the caller was trying to solicit air conditioner purchases. Franke also understood that to be the purpose of the meeting.

As to the alleged attempt to divide the market geographically, Franke testified that he never received any promises as to exclusivity of market or product. Rutherford, however, understood that Peachtree had the exclusive right to sell air conditioners in the Atlanta add-on market. There is no other testimony with respect to geographic market division, except that Howell Adams testified that he had neither knowledge nor recollection of any meeting where the subject was confinement of Peachtree and Comfort competition to certain geographic markets.

### (3) *Alleged Excessive Competition Contrary to Defendants' Orders*

Comfort argues that, contrary to defendants' direct orders, and in spite of threats, it engaged in an aggressive sales policy in the residential add-on and commercial air conditioning markets: Comfort began to sell a lower cost Trane air conditioning unit, "The Cumberland", in the residential add-on market and increased the size of commercial projects on which it would submit bids.

The Cumberland was a stripped down Trane manufactured air conditioning unit designed to serve the new construction (builder) market. It was marketed by Trane for large quantity sales to apartment builders, and not for distribution in the residential add-on market. Cumberlands were not to play a role in the Home Comfort Center concept because these units were not consistent with the marketing program of selling top qualify products and service along with "professionalism", according to Roth's testimony.

Roth admitted that Trane had tried to persuade several distributors operating in the residential add-on market who were selling Cumberlands to discontinue these sales. However, Trane never refused to sell equipment to those dealers selling Cumberlands contrary to Trane's efforts.

In the Spring of 1973 Comfort began selling the Cumberland unit in the residential add-on market. In March 1974 Vernado arranged a meeting at Comfort at the direction of Thomas Adams. Present at

---

6. The Home Comfort Center marketing program was directed at the sale of air conditioning units to existing, single family residences.

The program entailed the sale of quality equipment along with professional service.

this meeting were Thomas Adams, Vernado, Haswell and Johnson. *No one from Trane or Peachtree was present.* Thomas Adams told Haswell to stop selling the Cumberland unit in the residential add-on market. Haswell maintains that Adams also threatened the loss of Haswell's Trane dealership unless Cumberland sales stopped. Adams also directed Haswell to fire Lewis, a Comfort salesman. Haswell testified that the reason offered by Adams for his demands was that sale of Cumberlands in the residential add-on market was not consistent with the professional image projected in the Home Comfort Center marketing program.

Thomas Adams denied ever making any threat to Haswell that he would "take his dealership" away. He also testified that he told Haswell to fire Lewis because several customers had called Adams complaining of being misled or coerced by Lewis. As to stopping sales of Cumberland units in the residential add-on market, Adams claimed that salesmen had been misrepresenting Cumberlands as the higher-priced Trane units. Johnson, Haswell's own sales manager, confirmed that several Comfort salesmen had sold Cumberlands, representing them to be Trane units. Some dissatisfied customers had their Cumberland units replaced with Trane air conditioners. One customer testified that he had been misled into believing that the unit he purchased was a Trane model when, in fact, a Cumberland was installed.

It is undisputed that individuals at Peachtree complained to Trane about Comfort's sale of Cumberlands in the add-on market. There is no *direct* testimony that Trane, Howell Adams & Associates, or Peachtree ever took or instigated retaliatory actions against Comfort for its Cumberland sales activities.

With respect to Comfort's efforts to increase the size of projects in the commercial air conditioning market upon which it submitted bids, plaintiffs point to defendant Howell Adams & Associates' refusal to furnish prices for the purpose of bid computation.

Without dispute price information was furnished by Howell Adams & Associates' representatives, but only at the last possible moment (i. e. the morning the bid was due). There is no evidence indicating any of Comfort's competitors were treated differently. The reason offered by Vernado for this practice was to promote truly competitive bids among different suppliers without the benefit of bid-readjustment after examining other bids.

There is some evidence of a communication between Howell Adams and Haswell regarding a commercial job on which Comfort and Peachtree were competing. Haswell maintains Adams told him to get Comfort "off the job". Howell Adams admits the telephonic communication, but asserts that he merely suggested that Comfort was wasting its time in bidding on this particular job since the owner intended to award the contract to Peachtree.

### b. *Alleged Retaliatory Actions*

For its refusal to fix prices, to divide the market geographically, to participate in a common telephone solicitation scheme, and for continued competition contrary to defendants' orders, plaintiffs contend that defendants entered into an agreement to interfere with and, ultimately, destroy plaintiffs' businesses. These alleged retaliatory actions took several forms: (1) having plaintiffs' bank set off against checking accounts; (2) attempting to have plaintiffs' landlord padlock Comfort's place of business; (3) attempting to hire plaintiffs' employees; and (4) foreclosing on a security interest.

### (1) *C & S Bank Set Off*

On June 28, 1974, Rieland, Trane's CPD credit manager, met with McDonald, an employee of Citizens and Southern Bank of Atlanta. Comfort's checking account was with C & S Bank. Prior to this meeting, Rieland and McDonald had never met face-to-face, but McDonald had called Rieland to inform him a $20,000 check from Comfort to Trane would not be honored because of insufficient funds.

Present at this meeting were Rieland, McDonald, and counsel for Trane and C & S Bank. McDonald recalls Howell Adams being present. Adams maintains that his brother Thomas, but not he, was present. *No one from Peachtree was present.*

The purpose of this meeting was to discuss the bank's and Trane's relative creditor relationships with Comfort, and to anticipate what activity other creditors might take against Comfort because of its then failing financial condition. Following this meeting McDonald personally decided to have C & S Bank set off against Comfort's accounts: the bank had loaned $49,000 in both corporate and personal loans to Haswell. At no time did Rieland ask McDonald to have C & S Bank set off against Comfort accounts.

Prior to the June 28th meeting, McDonald had informed Haswell that when his note to the bank came due on June 28th, the bank intended to debit Haswell's accounts for $20,000 unless timely payment was made. McDonald was aware that Comfort was delinquent in employee withholding taxes and feared the Internal Revenue Service might impose a tax lien on Comfort. Additionally, all during 1974 C & S Bank's internal loan oversight committee had classified Comfort's loan as a "problem loan".

Approximately one week after the set off, the bank reversed its action because Rieland told McDonald that Trane's security position was inferior to the bank's.

### (2) Landlord Meeting

Plaintiffs also complain that defendants attempted to have Byrd, lessor of the buildings occupied by Comfort, padlock the premises. Trane initiated this meeting, through credit manager Rieland, for the purpose of discussing protection of and access to Comfort assets in the event Trane chose to foreclose on its security interest. The necessity of this meeting was evident, for, if Trane chose to foreclose, Byrd would have to grant it admission to the premises. At the time of this meeting, in late June or early July of 1974, Comfort was not in default under the terms of its lease with Byrd.

### (3) Attempt to Hire Comfort Employees

There is some evidence in the record respecting a purported attempt by defendant Trane to hire Comfort employees prior to the company's demise. This meeting occurred on the same day Rieland made his final decision to recommend foreclosure. There is no evidence in the record suggesting that these employees in fact left Comfort for employment with another Trane distributor or that this meeting, in any way, contributed to or was the proximate cause of Comfort's business failure. If any of defendants' actions might be deemed the proximate cause of plaintiffs' demise, it would have to be Trane's decision to foreclose.

### (4) Decision to Foreclose

Plaintiffs complain that Trane chose to foreclose against Comfort while forgiving a substantial debt to a competitor, Peachtree. Whether these actions were prompted by legitimate business considerations or anticompetitive animus can be determined only by scrutinizing Comfort's and Peachtree's respective credit relationships with Trane.

### Comfort

In the summer of 1971 Roth had assisted Haswell in purchasing Comfort: as Trane's representative in the negotiations he was able to provide the necessary financial guaranty. Thereafter, Haswell purchased equipment from Trane on an open account basis. Twice during 1972 Comfort's account was sufficiently past due to cause Trane to put Comfort on a cash-in-advance basis for all purchases. During 1973 Comfort's account customarily ran approximately 30 days past due; however, Trane left the credit line open and continued to ship equipment. In December, 1973, Haswell spoke with Rieland about Trane extending Comfort a credit line of approximately $250,000 to $300,000. Haswell sought a substantial amount of credit because he wanted to acquire equipment prior to a price increase, and to expand his residential

sales. Because Trane had never extended that amount of credit to Haswell's companies, Trane required Haswell to execute a security agreement and personal guaranty in Trane's behalf, and to provide Trane with monthly financial statements so Trane could monitor Comfort's financial performance.

In the period between February 7, 1974, when the security agreement was executed, and September 30, 1974, when Trane instituted foreclosure, several significant events occurred.

First, after Comfort had defaulted initially, under the terms of the security agreement, Trane agreed to three different pay back arrangements, each of which Haswell and Comfort failed to satisfy.

Second, Comfort was acting as a self-insurer after discontinuing premium payments for employee health insurance. At the same time, Comfort continued to deduct money from employees' compensation checks for that purpose. Some Comfort employees encountered difficulty in having their hospital bills paid because of nonpayment of premiums.

Third, Comfort owed the Internal Revenue Service $233,000 in employee withholding tax payments it had failed to make while continuing to make withholding deductions from employees' compensation checks. Haswell paid himself $30,000 in salary even though employee withholding tax payments were not made. Rieland's recommendation to foreclose was made in September 1974. He had assumed Comfort was current in its employee withholding tax payments during July and August of 1974. He recommended foreclosure only after he learned that Comfort's debt to the Internal Revenue Service was substantially larger than it had been represented to him by Haswell in early September.

Fourth, employees' compensation checks were not being honored by Comfort's bank while Haswell continued to draw his own salary.

Fifth, Comfort not only failed to provide financial statements and data required for Trane's extension of credit, but also failed to cooperate with the certified public accountants performing the financial audit requested by Trane.

Sixth, funds were being transferred between Haswell's swimming pool [7] and air conditioning operations for the purpose of meeting operating expenses (e. g. payroll accounts), to the extent of about $80,000. There was also concern that Haswell was devoting too much time and effort toward the swimming pool operations, at the expense of the two air conditioning companies.

Seventh, even while Comfort was in technical default under the security agreement, Trane opened a small line of credit so Comfort could purchase parts for servicing customers' air conditioning units.

Eighth, Trane credit manager Rieland reversed his initial decision to recommend foreclosure and decided to give Haswell another opportunity to satisfy the terms of the latest payback agreement.

### Peachtree

In October 1970 Plummer Company (Peachtree's corporate predecessor) was acquired from Plummer by Trane. This purchase was to enable Plummer to become Trane's marketing manager for consumer products. Franke became the president of Peachtree in March 1972 with the understanding that he would purchase the business at a price to be determined once operations were stabilized.

Plaintiffs complain that at the same time Trane agreed with Comfort to the repayment of a debt owed under the security agreement, Trane permitted Peachtree to repay its own debt under a more leisurely schedule. At that time, however, Comfort was an independently owned distributor with a history of delinquent payments,

---

**7.** In 1974 Haswell had established Home Center Corporation. This corporation was a subsidiary of Haswell Enterprises and served as national distributor for Instant Pool Corporation, a swimming pool manufacturer.

while Peachtree was a wholly owned subsidiary of Trane making current payments on purchases.

Plaintiffs also find some evil motive in the fact that while Trane chose to foreclose against Comfort it simultaneously forgave a substantial debt owed by Peachtree. The debt forgiven as part of the consideration of the sale of Peachtree to Franke was a debt incurred by Franke's predecessor. It must be noted that while Comfort fell further behind in its debt to Trane, Peachtree, under Franke, stayed current on all purchases. Furthermore, Peachtree operated at a profit during the time in question except for the fact that deferred recognition of liabilities incurred by Franke's predecessor caused book losses.

The record is also clear that during 1974,[8] when negotiations for a specific purchase price for Peachtree were underway between Franke and Trane, Franke was not aware of Trane's security agreement with Comfort or that Trane intended to foreclose. Roth never consulted Franke about Trane's decision to foreclose, nor is there any evidence that anyone from Howell Adams & Associates ever discussed the foreclosure with Franke.

### B. ANALYSIS

At the close of all the evidence the district court directed a verdict against plaintiffs on their antitrust claims, finding that there was no showing of any conspiracy in restraint of trade and that all defendants' actions were based on business necessity.[9] Hence, the ultimate conclusion reached by the district court in directing a verdict was that plaintiffs' business failures were not caused by any conduct of defendants pro-

scribed by the antitrust laws. In reviewing the district court's directed verdict, we are guided by the standard for directing verdicts, generally, as well as the substantive legal tests set forth in section 1 of the Sherman Act, 15 U.S.C. § 1 (1976), and section 4 of the Clayton Act, 15 U.S.C. § 15 (1976).

▆▆ We measure the propriety of a directed verdict by the standard enunciated by this Court in *Boeing Co. v. Shipman*, 411 F.2d 365, 374–375 (5th Cir. 1969) (en banc).

On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in

---

**8.** Peachtree was sold to Franke on December 31, 1974.

**9.** The district court judge's oral findings delivered from the bench were as follows:

[I]n this case *there has not been a showing of any combination or conspiracy* in restraint of trade. In short, there has been *no connection between* these agents on the part of Trane and/or others who are *named* as *defendants* in this case *and the problems that beset Mr. Haswell's business.*

Record, Vol. 15, at 176 (emphasis added).

The district court judge continued, saying: [I]rrespective of the Trane Company's true reasons for tightening the credit of Mr. Haswell's companies, if they had any reason other than what I believe the evidence demonstrated solely, and that is a question of business necessity, I don't see any evidence of any conspiracy or agreement, certainly with Peachtree Trane and not with Howell Adams & Associates.

Record, Vol. 15, at 178.

substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

411 F.2d at 374–75 (footnote omitted). *Accord McCullough v. Beech Aircraft Corp.*, 587 F.2d 754, 758 (5th Cir. 1979); *Wansor v. George Hantscho Co.*, 570 F.2d 1202, 1207 (5th Cir. 1978). Unsupported, self-serving testimony is not substantial evidence sufficient to create a jury question. *Yoder Brothers, Inc. v. California-Florida Plant Corp.*, 537 F.2d 1347, 1371 (5th Cir. 1976), *cert. denied*, 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977). Similarly, inferences can not stand in the face of uncontradicted and substantial evidence to the contrary. *Scott Medical Supply Co. v. Bedsole Surgical Supplies, Inc.*, 488 F.2d 934, 937 (5th Cir. 1974).

A directed verdict must also be reviewed in the context of the substantive legal claims presented. Plaintiffs here sought relief under section 4 of the Clayton Act, 15 U.S.C. § 15 (1976), for a conspiracy defendants allegedly entered into in violation of section 1 of the Sherman Act, 15 U.S.C. § 1 (1976).

Section 4 of the Clayton Act provides that "Any person who shall be injured in his business or property *by reason of anything forbidden in the antitrust laws* may sue therefor in any district court of the United States . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15 (1976). The proscribed anticompetitive activity must be a *material cause* of the injury. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571 n. 9, 23 L.Ed.2d 129 (1969). The plaintiff need not show that "defendant's wrongful actions were the sole proximate cause of the injuries [sustained.] [The plaintiff] must show only, as a matter of fact and with a fair degree of certainty, that defendant's illegal conduct *materially contributed to the injury.*" *Terrell v. Household Goods Carri-*

*ers' Bureau*, 494 F.2d 16, 20 (5th Cir.) (footnote omitted, emphasis added), *cert. dismissed*, 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974). *Accord, Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 317 (5th Cir. 1978). *See generally* L. Sullivan, Handbook of the Law of Antitrust 772 (1977).

Although the question of causation is generally a factual question for the jury, *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 702, 82 S.Ct. 1404, 1412, 8 L.Ed.2d 777 (1962), a court should direct a verdict where the plaintiff has failed to present substantial evidence that defendant's illegal practices were a material cause of plaintiff's injuries. *Foremost-McKesson, Inc. v. Instrumentation Laboratory, Inc.*, 527 F.2d 417, 420 (5th Cir. 1976). *Accord, Kestenbaum v. Falstaff Brewing Corp.*, 514 F.2d 690, 694 (5th Cir. 1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1412, 47 L.Ed.2d 349 (1976); *Shumate & Co. v. National Association of Securities Dealers, Inc.*, 509 F.2d 147, 153 (5th Cir.), *cert. denied*, 423 U.S. 868, 96 S.Ct. 131, 46 L.Ed.2d 97 (1975).

Even prior to establishing causation, plaintiffs could recover damages under section 4 of the Clayton Act only if they could prove the existence of a conspiracy to restrain trade in violation of section 1 of the Sherman Act. Proof of a conspiracy in violation of section 1 need not demonstrate an express agreement. *United States v. General Motors Corp.*, 384 U.S. 127, 142–43, 86 S.Ct. 1321, 1329, 16 L.Ed.2d 415 (1966); *Gainesville Utilities Department v. Florida Power & Light Co.*, 573 F.2d 292, 300 (5th Cir.), *cert. denied*, —— U.S. ——, 99 S.Ct. 454, 58 L.Ed.2d 424 (1978). Circumstantial evidence may be sufficient. *American Tobacco Co. v. United States*, 328 U.S. 781, 809–10, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946); *H & B Equipment Co. v. International Harvester Co.*, 577 F.2d 239, 245 (5th Cir. 1978). Moreover, actions innocent and lawful in themselves become actionable when undertaken pursuant to an unlawful conspiracy. *Cf., Simpson v. Union Oil Co.*, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98

(1964) (failure to renew gasoline station lease after lessee did not comply with gasoline company's resale price maintenance consignment agreement); *Greene v. General Foods Corp.*, 517 F.2d 635 (5th Cir. 1975), *cert. denied*, 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 348 (1976) (termination of distributorship because of failure to adhere to producer's resale price maintenance scheme). But "evidence of conspiracy consisting wholly of a series of inferences cannot stand against overwhelming evidence that the challenged action was taken unilaterally for sound business reasons." *Feminist Women's Health Center, Inc. v. Mohammad*, 586 F.2d 530, 549 (5th Cir. 1978), citing *Solomon v. Houston Corrugated Box Co.*, 526 F.2d 389 (5th Cir. 1976), *and Scott Medical Supply Co. v. Bedsole Surgical Supplies, Inc.*, 488 F.2d 934 (5th Cir. 1974). The case sub judice falls within that category of antitrust actions alluded to in *Feminist Women's Health Center* in which evidence of an alleged conspiracy consists wholly of a series of inferences.

Under the general standards discussed above, the district court's directed verdict would be erroneous only if plaintiffs, in opposition to defendants' motion, adduced substantial evidence that a conspiracy in restraint of trade entered into by defendants materially contributed to plaintiffs' business failures. Plaintiffs' evidentiary burden encompassed two crucial elements of establishing section 4 liability: a conspiracy, and a causal connection between that conspiracy and plaintiffs' business failures. Since defendants' business necessity defense prevailed in the district court over a series of inferences plaintiffs urged the trier of fact to draw, we need only juxtapose plaintiffs' inferences and defendants' direct business justification evidence to determine whether the district court erred in directing a verdict.

Plaintiffs would have had the jury, as trier of fact, infer that defendant Trane tried to cause C & S Bank to set-off against Comfort accounts, attempted to have Comfort's landlord Byrd padlock Comfort's business premises, tried to hire Comfort employees, and initiated foreclosure proceedings to interfere with and terminate Comfort's business. Defendants produced direct evidence clearly demonstrating that the bank's set-off against Comfort accounts was not requested by defendant Trane and had been contemplated prior to the June 28th meeting. Defendants' evidence also showed that Byrd was contacted for the purpose of determining how access to and protection of Comfort assets would be provided for in the event Trane chose to foreclose. Trane's representatives discussed future employment with Comfort employees on the same day Trane decided to institute foreclosure proceedings because of Comfort's fatal financial prognosis. Trane chose to foreclose only because of Comfort's inability to reduce its substantial debt to Trane, Comfort's inability to meet the terms of three payback agreements entered into by Trane, and the discovery of a $233,000 debt owed to the Internal Revenue Service for failure to make employee withholding tax payments.

Plaintiffs' theory required the trier of fact to infer that defendant Trane undertook anticompetitive actions pursuant to an agreement among Trane, Peachtree and Howell Adams & Associates. Furthermore, the jury needed to infer that the reason Trane would have entered such a conspiracy was in retaliation for Comfort's refusal to fix prices, divide the market geographically, engage in a common telephone solicitation scheme, and for Comfort's continued competition in the residential add-on and commercial air conditioning markets. Trane's incentive to retaliate would exist only if it knew about Comfort's activities in each of the instances outlined above. The evidence clearly shows that there was no Trane representative in attendance at the various meetings at which anticompetitive schemes were discussed. To support the inference of knowledge or participation by Trane, plaintiffs point to a "suggestion" made by Roth one and one-half years before Trane's foreclosure that Comfort cooperate with Peachtree so they would not "bump heads".

Plaintiffs, by way of anticompetitive motive, also suggest that Trane's actions were

designed to convey a message to other independent Trane dealers, to show what Trane would do to a "troublemaker". In support of this assertion, plaintiffs only produced evidence showing that Trane communicated with its Trane Comfort Corps dealers through annual meetings, a company magazine, and a dealer association. There was no evidence of the nature of these communications, whether Trane ever had problems with other dealers, or whether Trane ever disciplined other dealers.

Although Trane's corporate structure required Roth to make the formal foreclosure decision, there is direct evidence that he merely accepted the recommendation made by CPD credit manager Rieland. Rieland's decision to foreclose was based on Comfort's inability to satisfy the terms of the payback agreement, the lack of required financial data, and the size of the debt owed to the Internal Revenue Service. There is also direct evidence that neither Rieland nor Roth ever consulted with Franke or anyone at Howell Adams & Associates about the decision to foreclose. Although there is some evidence that a Howell Adams & Associate representative participated in the mechanics of Trane's foreclosure, there is also direct evidence that he did so at Trane's explicit instruction after the decision to foreclose had been made. Franke never knew that Trane had a security agreement with Comfort.

Plaintiffs' theory on this appeal is based upon *Lehrman v. Gulf Oil Corp.,* 464 F.2d 26 (5th Cir.), *cert. denied,* 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972). In *Lehrman,* a gas station operator alleged that he was denied price support—punished—when he refused to follow Gulf's suggested retail minimum prices on gasoline. Two theories were offered. First, Lehrman theorized that Gulf conspired with Lehrman's competitor to deny price support in an effort to force Lehrman to adhere to Gulf's suggested prices in the course of future operations. Second, Gulf's withdrawal of price support may have been designed to convey a message to Gulf's other retail dealers by demonstrating the ramifications of refusing to adhere to Gulf's "suggested" prices. In af-

firming the jury verdict imposing liability on Gulf for unlawful coercive action, this Court emphasized four evidentiary points: (1) direct testimony that Gulf discontinued price supports to Lehrman only after a competitor complained to Gulf that Lehrman was charging too little for gasoline; (2) the specificity of the price suggestions, coupled with the economic significance of the price support system, implied that adherence to "suggested" prices and price supports went hand in hand; (3) Gulf fixed Lehrman's prices through a consignment agreement until the Supreme Court held such agreements unlawful; and (4) the absence of any evidence to prove that the competitor's complaint to Gulf was causally unrelated to Gulf's decision to discontinue price supports to Lehrman. In the case at bar, there is no substantial evidence that a conspiracy in restraint of trade materially contributed to Comfort's demise. There is, however, overwhelming evidence to show that Trane's actions were each based upon legitimate business considerations, unrelated to any anticompetitive motive. Under *Boeing Co. v. Shipman,* 411 F.2d 365, 374–76 (5th Cir. 1969) (en banc), and applicable standards under section 1 of the Sherman Act and section 4 of the Clayton Act, we affirm the directed verdict entered against plaintiffs on their antitrust claim.

## II. *DIRECTED VERDICT—COUNTER-CLAIM FOR DEFICIENCY JUDGMENT*

Defendant Trane contends the district court erred in directing a verdict against its counterclaim because the court improperly held that the question of the commercial reasonableness of Trane's liquidation sale was a question of law for the court, and not a question of fact for the jury. Plaintiffs maintain that, even assuming that the question of commercial reasonableness is ordinarily a jury question, the district court properly directed a verdict under the circumstances. Plaintiffs argue that under *Granite Equipment Leasing Corp. v. Marine Development Corp.,* 139 Ga.App. 778, 230 S.E.2d 43 (1976), a secured party is preclud-

ed from obtaining a deficiency judgment from a debtor, who has challenged the commercial reasonableness of a sale disposing of repossessed collateral, unless the secured party overcomes the presumption that the value of the collateral at the time of repossession is equal to the debt owed. Plaintiffs confuse the *Granite* presumption with an analogous presumption imposed by jurisdictions other than Georgia.

In some jurisdictions the failure of a secured party to comply with the requirements of U.C.C. § 9–504(3) does not absolutely bar recovery of a deficiency judgment. *See, e. g., Kobuk Engineering & Contracting Services, Inc. v. Superior Tank & Construction Co-Alaska, Inc.,* 568 P.2d 1007 (Alaska 1977); *Community Management Association of Colorado Springs, Inc. v. Tousley,* 32 Colo.App. 33, 505 P.2d 1314 (1973); *Clark Leasing Corp. v. White Sands Forest Products, Inc.,* 87 N.M. 451, 535 P.2d 1077 (1975). In these jurisdictions a deficiency judgment may still be obtained even where the secured party has failed to dispose of the collateral in a commercially reasonable manner or has failed to give reasonable notice to the debtor of the intended disposition. To obtain a deficiency, however, the secured party must introduce sufficient evidence to overcome the presumption that the value of the collateral seized was equal to the amount due on the debt. Evidence of the amount received at the sale of the collateral is not sufficient to rebut the presumption; the secured party

must come forward with other evidence of the collateral's value. *Community Management Association of Colorado Springs, Inc. v. Tousley,* 32 Colo.App. 33, 505 P.2d 1314, 1317 (1973); *Clark Leasing Corp. v. White Sands Forest Products, Inc.,* 87 N.M. 451, 535 P.2d 1077, 1082 (1975). The presumption may be overcome by evidence of a fair and reasonable appraisal at or near the time of repossession or "convincing" evidence of the value of the collateral. *Kobuk Engineering & Contracting Services, Inc. v. Superior Tank & Construction Co-Alaska, Inc.,* 568 P.2d 1007, 1013–14 (Alaska 1977).

In the State of Georgia, however, strict compliance with all the requirements of Ga.Code Ann. § 109A–9–504(3)[10] is a condition precedent to recovery of any deficiency between sale price of the collateral and the debt owed. *Gurwitch v. Luxurest Furniture Manufacturing Co.,* 233 Ga. 934, 214 S.E.2d 373 (1975); *Braswell v. American National Bank,* 117 Ga.App. 699, 161 S.E.2d 420 (1968). Under section 109A–9–504(3) the secured party has the right to dispose of the collateral repossessed from the debtor so long as every aspect of the disposition—method, manner, time, place and terms—are commercially reasonable. The question of commercial reasonableness is generally for the jury. *Ennis v. Atlas Finance Co.,* 120 Ga.App. 849, 172 S.E.2d 482, 484 (1969).[11] After the commercial reasonableness of the secured party's dispo-

10. In relevant part, Ga.Code Ann. § 109A–9–504(3) provides:

109A–9–504 Secured party's right to dispose of collateral after default; effect of disposition

  \*  \*  \*  \*  \*  \*

(3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any

private sale or other intended disposition is to be made shall be sent by the secured party to the debtor . . . .

11. Plaintiffs cite *Granite Equip. Leasing Corp. v. Marine Dev. Corp.,* 139 Ga.App. 778, 230 S.E.2d 43, 44 (1976), to support the proposition that commercial reasonableness is a question of law for the court. After examining the development of the line of authority cited by the *Granite* court, it is clear that *Granite* only stands for the proposition that, as in any jury case, the trial judge may withdraw the question of commercial reasonableness from the jury and direct a verdict. *See Dynalectron Corp. v. Jack Richards Aircraft Co.,* 337 F.Supp. 659, 663 (W.D.Okl.1972). *See also California Airmotive Corp. v. Jones,* 415 F.2d 554, 556 (6th Cir. 1969).

sition has been challenged, the burden is placed upon the secured party to prove it was commercially reasonable. *Granite Equipment Leasing Corp. v. Marine Development Corp.,* 139 Ga.App. 778, 230 S.E.2d 43, 44 (1976).

> But in order for the secured party to *first* meet its burden of proving every aspect of the sale to be commercially reasonable, it must establish affirmatively that the "terms" of the sale were commercially reasonable; this includes a burden to show that the resale price was the fair and reasonable value of the collateral. . . . *The burden is on the secured party to prove the value of the collateral at the time of repossession and that such value does not equal the debt; failure to so prove results in a presumption that the value was at least the amount of the debt.*

*Id.* (Emphasis added in last sentence).

▮▮▮▮▮ Plaintiffs contend that if a secured party fails to introduce sufficient evidence of the repossessed collateral's value at the time of possession, the presumption operating in favor of the debtor precludes recovery of a deficiency judgment. This theory is misplaced. Plaintiffs' logic is applicable in those jurisdictions creating the presumption after a showing has been made that the requisite notice of resale was not given or that the secured party's disposition of the collateral was commercially unreasonable. In Georgia, a secured party is absolutely prohibited from recovering a deficiency judgment where notice is not given or the sale is commercially unreasonable. The presumption is invoked, in the first instance, when the question before the trier of fact *is* whether the disposition was commercially reasonable. The effect of the presumption, if unrebutted, is to impose a greater burden on the secured party to prove the *price term* of the disposition was commercially reasonable in light of the fact that the value of the collateral at the time of repossession was equal to the debt owed. The failure of the secured party to obtain a price equal to the presumed value does not make the sale commercially unreasonable per se. This circumstance would be one

fact taken into account by the trier of fact in determining whether the sale was commercially reasonable. An analogous situation, illustrating this logic, is found in *Ace Parts & Distributors, Inc. v. First National Bank,* 146 Ga.App. 4, 245 S.E.2d 314 (1978).

In *Ace Parts* the Court of Appeals of Georgia rejected a debtor's contention that the secured party failed to prove the value of the collateral at the time of repossession or that its resale price was fair and reasonable. Examination of the record in *Ace Parts* revealed that thousands of automobile parts repossessed were worth $39,000 at the time of repossession, that these parts were stored in the secured party's warehouse at no charge to the debtor, that bids were solicited from 150 auto part dealers, that approximately one dozen inquiries were made, that five bids were submitted, and that the collateral was sold to the highest bidder for $15,000. Under these circumstances, the court held the sale to be commercially reasonable. This conclusion could be reached in part because there was adequate evidence to compare value at time of repossession with sale price. Although the amount received was less than one-half the collateral's value at the time of repossession, the court still concluded that every aspect of the sale was commercially reasonable.

Assuming, *arguendo,* that the debt owed in *Ace Parts* was $40,000, the question remains whether the result would have been the same had there been no evidence that the value of the auto parts at the time of repossession was $39,000. If that were the case, the presumption would operate: the parts would be deemed to be worth $40,000 at the time of repossession. All other facts remaining the same, the difference in $1,000 arguably would not change the result: if the price term was commercially reasonable where direct evidence showed it to be less than one-half the collateral's value at the time of repossession, it would be commercially reasonable where it was less than one-half the *presumed* value. We conclude, therefore, that the effect of the

*Granite* presumption is to provide a value against which the price obtained upon the secured party's disposition of the repossessed collateral can be measured for the purpose of deciding whether the price term was commercially reasonable. The presumption does not operate, as in those other jurisdictions discussed above, to deny a secured party a deficiency judgment.

■ In the case at bar, Trane, on its counterclaim, sought $163,470.05 from Comfort. Trane claims this amount is the balance of Comfort's debt remaining after application of liquidation proceeds. Comfort disputes the accuracy of this figure.

The evidence before the district court showed that Trane initiated foreclosure proceedings on September 30, 1974, in the State Court of DeKalb County, Georgia. Trane sought possession of Comfort's assets. Under the terms of the security agreement entered into between Trane and Comfort, Trane was entitled to possession of collateral or proceeds thereof upon default by Comfort. The collateral in which Trane had a security interest included contract rights, accounts receivable, inventory, equipment, various forms of obligations, cash and chattel paper. On October 18, 1974, a writ of possession issued from the state court. Thereafter, Trane began the process of liquidating the collateral in its possession.

The exhibits entered into evidence show that as of September 25, 1974, Comfort owed Trane $152,920.98. Proceeds from liquidation totaled $73,785.68.[12] Of that amount, $50,000 was paid to Charles Orr Construction Company, a secured creditor with an interest prior to Trane's. The balance remaining is $129,135.30. Trane attempts to account for the difference by pointing to late shipments and other expenses properly chargeable to Comfort. For the purposes of discussion, we will consider $163,470.05 to be the proper amount.

At trial Trane also produced evidence that: (a) Trane gave Comfort full credit for all equipment purchased from Trane and subsequently returned; (b) Trane employed Comfort's former vice-president and service manager, Art Divon, who had been responsible for purchasing parts for Comfort, to set prices on air conditioning parts and equipment to be sold at liquidation; (c) Trane consulted with Haswell during the liquidation process, seeking his opinion on appropriate prices for items to be sold; (d) Trane obtained opinions from individuals dealing in furniture on what they believed to be the reasonable value of the type of office furniture being sold; (e) Trane had a person in the shop equipment business advise it on the reasonable price for some shop equipment and tools to be sold; (f) the inventory liquidation was conducted from Comfort's warehouse (Trane paying the rent) for two months and thereafter from another location for almost one year; (g) sale of inventory was announced by mail to several hundred people or companies involved in the air conditioning or related businesses; and (h) 125 separate sales transactions were made. Under these circumstances, had Trane obtained a deficiency judgment in a Georgia state court after the trier of fact concluded that disposition of the collateral was commercially reasonable, affirmance would seem to be required by *Ace Parts*. The only factual difference between that case and this is the absence of direct evidence on the value of collateral at time of repossession. Nevertheless, the operation of the unrebutted presumption in this case means that the price term (total

---

12. Proceeds came from collection of accounts receivable and liquidation of personal property. Proceeds from collection of accounts receivable totaled $28,145.38: Trane received payments on 109 accounts from November 2, 1974 through September 1, 1975. Proceeds from the liquidation of inventory, furniture, and miscel-laneous items totaled $45,640.30. This amount was derived from two sources: (a) 125 private sales from October 29, 1974 through September 3, 1975; and (b) credit given by Trane for equipment purchased by Comfort and returned to Trane after foreclosure.

proceeds from liquidation—$73,785.68) must be compared to the outstanding debt ($163,-470.05) in determining whether the price term was commercially reasonable. In *Ace Parts* the sale was considered commercially reasonable where the sale price ($15,000) was less than one-half the collateral's value at time of repossession ($39,000). Here the amount received ($73,785.68) is also less than one-half the presumed value of the collateral at the time of repossession ($163,-470.05). The dispositive facts would appear to be the number of individuals or companies notified of the sale, the number of sales consummated, and the length of time the liquidation procedure occurred.

We conclude, therefore, upon the authority of *Ace Parts* that the district court erred in directing a verdict against defendant Trane, deciding as a matter of law that Trane's disposition was commercially unreasonable. There is substantial evidence from which reasonable and fair-minded jurors could have drawn different conclusions. *Boeing Co. v. Shipman*, 411 F.2d 365, 374–76 (5th Cir. 1969) (en banc).[13]

### III. SUMMARY JUDGMENT—STATE LAW TORT CLAIMS

In addition to seeking damages under the antitrust laws, plaintiffs alleged that defendants committed various torts

---

**13.** Plaintiffs also assert that the district court's directed verdict was proper because Comfort was not given "reasonable notification" of Trane's intended disposition of the repossessed collateral as required by Ga.Code Ann. § 109A–9–504(3). The transcript of the trial does not reflect this basis for the district court's direction of the verdict. Such a basis would have been erroneous for the evidence raised a substantial jury question.

In the district court there was testimony that Haswell was contacted by Trane during the liquidation process and asked his opinion on appropriate prices for items to be sold. Additionally, the liquidation of inventory was conducted from Comfort's own warehouse for two months. On these facts, the question is whether there was substantial evidence from which reasonable and fair-minded jurors, applying Georgia substantive law, could have concluded that Comfort, through its president Haswell, had actual notice of Trane's disposition of the collateral sufficient to satisfy the "reasonable notification" requirement of section 109A–9–504(3).

It is clear that in Georgia strict compliance with section 109A–9–504(3) is a condition precedent to recovery of a deficiency judgment. *Gurwitch v. Luxurest Furniture Mfg. Co.*, 233 Ga. 934, 214 S.E.2d 373 (1975); *Braswell v. American Nat'l Bank*, 117 Ga.App. 699, 161 S.E.2d 420 (1968). Georgia courts, however, have not spoken on the question of oral notification or participation by the debtor in the liquidation process as satisfying the notice requirement or estopping the debtor from raising inadequate notice as a defense.

Other jurisdictions confronted with this issue have held that oral notification or debtor behavior can constitute "reasonable notification". *See Undernehr v. Gundlach*, 21 U.C.C.Rep. Serv. 351 (Ark.1977) (sufficient notice even where letter containing explanation of debtor's right of redemption and time and place of sale arrived nine days after sale to begin, because collateral not sold until two months later, and debtor had come to location of sale, learned that collateral not yet sold, and referred to attorney to exercise right of redemption); *Bondurant v. Beard Equip. Co.*, 345 So.2d 806 (1st Fla.Dist.App.1977) (sufficient notice where secured party told debtor that collateral was to be sold at secured party's place of business and debtor was going to be held liable for deficiency). *But see DeLay First Nat'l Bank & Trust Co. v. Jacobson Appliance Co.*, 196 Neb. 398, 243 N.W.2d 745 (1976) (written notice required as a matter of law because of the definition of "send" in U.C.C. § 1–201(38) ("to deposit in the mail or deliver for transmission by any other usual means of communication with postage or cost of transmission provided for")). The *Bondurant* court expressly rejected the construction put upon U.C.C. § 9–504(3) in *DeLay First National Bank*. The *Bondurant* court held that the definition of "send" in U.C.C. § 1–201(38) applied only to written notice, but that the "reasonable" notice requirement of U.C.C. § 9–504(3) should be defined by looking to the definitions of notice in U.C.C. §§ 1–201(25), (26), (27) ("notice" where there is actual knowledge or where there is reason to know from all the facts and circumstances).

Where there is conflicting evidence on the nature and extent of the debtor's knowledge, the debtor should not be estopped from raising lack of notice as a defense. Rather, the question of "reasonable notification" should be submitted to the jury. *See Wheeless v. Eudora Bank*, 256 Ark. 644, 509 S.W.2d 532 (1974).

Hence the district court erred if it directed a verdict because of insufficient notice to plaintiffs: there was substantial evidence from which reasonable and fair-minded jurors might have concluded that Comfort had actual knowledge of the liquidation.

under state law: tortious interference with business relationships, wrongful foreclosure on accounts receivable, wrongful attempts to incite creditors and cause a petition of involuntary bankruptcy to be filed, and slander. In response to defendants' motions for summary judgment on these state law torts, plaintiffs did not refer to specific factual contentions forming the basis of their claims. Plaintiffs merely referred generally to the activities and conduct of defendants as set forth in their antitrust claims.[14] The district court granted partial summary judgment against plaintiffs on their state law tort claims, holding that plaintiffs failed to satisfy their burden under Fed.R.Civ.P. 56(e). We agree.[15]

Rule 56(e) provides in pertinent part: When a motion for summary judgment is made and supported as provided in this rule *an adverse party may not rest upon the mere allegations or denials in his*

---

14. Plaintiffs' brief in opposition to defendants' motions for summary judgment on the state law tort claims was a mere three paragraphs of conclusory statements:

   *State Law Torts*
   By virtue of its pendant jurisdiction this Court can take cognizance of state law torts. Essentially the claim here is that the activities and conducts [sic] of the Defendants which are set out in the statement of facts above, constitutes certain torts under state law. This is alleged in paragraph 31 of the Complaint. Again, the basic issues between the Plantifs [sic] and Defendants are whether the activities of the Plaintiffs [sic] were carried out in good faith for legitimate business purposes or whether they were done wrongfully and maliciously with an intent to damage and injure the business of Plaintiffs.
   Plaintiffs [sic] complain of the lack of specificity in the allegation of these torts, however the considerable volume of evidence presently before the Court shows a course of conduct and activities undertaken with an intent to injure and destroy the business of Plaintiffs. Whether the legal consequences of the facts constitute violations of federal antitrust laws or state tort laws, Plaintiffs are entitled to recover for the damage which has been suffered.
   Defendants' Brief on this point is largely a lengthy recitation attempting to persuade the Court to accept Defendants' version of the facts. The factual statement in this brief given above is adequate to demonstrate that there are material facts in dispute and that the Plaintiffs have ample evidence to take their case to a jury. The facts exist, the state law casues [sic] of action exist and Plaintiffs are entitled to recover for their damage whether the legal cause of action be denominated a state law tort or federal antitrust violation.
   Record, Vol. 3, at 815–16.

15. Defendants assert that plaintiffs cannot raise this point on appeal because the notice of appeal does not specify the district court's order of April 2, 1976, in which partial summary judgment was granted. *See generally* Fed.R. App.P. 3(c) ("The notice of appeal shall . . designate the judgment, order or part thereof appealed from . . . ."). Cases from other circuits seem to lend support to defendants' position. *See Elfman Motors, Inc. v. Chrysler Corp.,* 567 F.2d 1252 (3d Cir. 1977); *Shaw v. Merritt-Chapman & Scott Corp.,* 554 F.2d 786, 789 (6th Cir.), *cert. denied,* 434 U.S. 852, 98 S.Ct. 167, 54 L.Ed.2d 122 (1977). The foundation of defendants' position, however, has been rejected by the Supreme Court of the United States.

   It is too late in the day and entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of such mere technicalities. "The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Conley v. Gibson,* 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80. The Rules themselves provide that they are to be construed "to secure the just, speedy, and inexpensive determination of every action." Rule 1.

   *Foman v. Davis,* 371 U.S. 178, 181–82, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) (reversing dismissal of appeal because of failure to specify in notice of appeal that review was sought of original judgment as well as district court's denial of motions to vacate the judgment and amend the complaint).
   The defendants' proposed construction of Fed.R.App.P. 3(c) is also inconsistent with the case law in this circuit, the purpose underlying a notice of appeal requirement, and the general attitude taken toward construction of procedural rules. *See Jones v. Chaney & James Constr. Co.,* 399 F.2d 84, 86 (5th Cir. 1968); *Markham v. Holt,* 369 F.2d 940, 941–43 (5th Cir. 1966); Fed.R.Civ.P. 1. Furthermore, defendants can show no prejudice in having this Court entertain plaintiffs' appeal on this point since they were given some notice of their adversaries' intention to seek review in the district court's pre-trial order. Both sides also briefed the issue before this court. Cf. *Foman v. Davis,* 371 U.S. 178, 181, 83 S.Ct. 227, 229, 9 L.Ed.2d 222 (1962).

*pleading, but his response,* by affidavit or as otherwise provided in this rule, *must set forth specific facts showing that there is a genuine issue for trial.* If he does not so respond, summary judgment, if appropriate, shall be entered against him.

Fed.R.Civ.P. 56(e) (emphasis added). Plaintiffs' allegations, in its pleadings and brief in opposition to defendants' motions for summary judgment, did not set forth the requisite specific facts upon which their state law tort claims were based. Therefore, defendants having previously established that there was no genuine issue of material fact for trial and that they were entitled to judgment as a matter of law, the district court properly granted summary judgment against plaintiffs on their state law tort claims. *See generally Munoz v.* *International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators of the United States and Canada,* 563 F.2d 205 (5th Cir. 1977).

## IV. CONCLUSIONS

On the basis of the foregoing we affirm the district court's entry of summary judgment against plaintiffs' state law tort claims and the verdict directed against plaintiffs on their antitrust claims. We reverse the verdict directed by the district court against the defendant Trane's counterclaim for a deficiency judgment and remand that portion of this case for further proceedings consistent with this opinion.

AFFIRMED in part; REVERSED and REMANDED in part.