**CITY OF CLEVELAND, Plaintiff,**

v.

**The CLEVELAND ELECTRIC ILLUMI-
NATING COMPANY, Defendant.**

**Civ. A. No. C75–560.**

United States District Court,
N. D. Ohio, E. D.

Sept. 24, 1981.

Opinion on Motion for Reconsideration
Oct. 16, 1981.

William B. Norris, Hahn, Loeser, Freed-heim, Dean & Wellman, James E. Young, Thomas E. Wagner, Director of Law, City of Cleveland, Cleveland, Ohio, for plaintiff.

John Lansdale, James P. Murphy, Squire, Sanders & Dempsey, Cleveland, Ohio, for defendant.

KRUPANSKY, District Judge.

Presently before the Court is the oral motion of the defendant The Cleveland Electric Illuminating Company (CEI) seeking, pursuant to Rule 50(a), Fed.R.Civ.P., a determination that insufficient evidence has been adduced to support the plaintiff City of Cleveland's contention that the defendant proximately caused the loss of generating capacity attributable to the demise of the City's 85 mw generating unit. The Court permitted oral argument on this particular issue during the course of proceedings conducted on September 11, 1981. See Transcript at pp. 16,390–99; 16,453–58; 16,-469–71. Thereafter, on September 14, 1981, the Court, following a comprehensive review of the record, extended to the City a further opportunity to direct the Court's attention to that evidence of record which bears upon the question of whether the defendant may be properly held accountable for the failure of the 85 mw generating unit. See Transcript at pp. 16,501–04. The plaintiff has, by memorandum of September 15, 1981, responded to the Court's foregoing request.

The instant record discloses that the plaintiff's damage claim is premised in substantial part on the fact the City of Cleveland's Division of Light and Power (commonly referred to as "Muny Light" or "MELP") no longer possesses generating capacity and is, as such, a "distribution only" system. See e.g. PTX 3041. It is the position of the City that the defendant's anticompetitive conduct has occasioned, in the words of the plaintiff's expert economic witness, Dr. Harold H. Wein, "the virtual elimination of MELP as a generating system." Transcript at p. 16,035.

In advancing its Rule 50(a) motion, however, CEI argues with considerable force that the evidence adduced during the plaintiff's case-in-chief fails to adequately support the City's contention that the defendant's conduct proximately caused the loss of generating capacity attributable to the demise of the 85 mw unit. It should be noted, however, that the motion at bar does not, as the Court understands it, challenge the City's damage claim insofar as it is predicated upon that loss of generating capacity associated with the three (3) 25 mw gas turbine generating units. See Transcript at pp. 16,394–95; 16,399. That is to say, it would appear to the Court that the instant motion is addressed solely to the question of whether there exists sufficient factual support in the record for the conclusion that the defendant's allegedly anti-competitive conduct was a substantial factor in bringing about the loss of generating capacity sustained by Muny Light upon the discontinuance of the 85 mw unit.

The City's attempt to hold the defendant answerable in damages for the loss of generating capacity associated with the 85 mw unit is essentially predicated upon CEI's failure to provide Muny Light with a permanent synchronous interconnection which the plaintiff maintains, and the evidence suggests, could have been operational as of January, 1973. Transcript at p. 15,566. The City asserts that the defendant's refusal to interconnect effectively precluded Muny Light from obtaining, during the period January, 1973 to July, 1974,[1] the "back up" power necessary to permit MELP to plan and perform maintenance on the 85 mw unit. It is the position of the plaintiff that the inability of Muny Light to maintain the large unit in a proper state of repair during the January, 1973–July, 1974 period precipitated, at least in substantial part, MELP's ensuing abandonment of the 85 mw unit.

A review of the record discloses that there is some evidence that the defendant's

---

1. As will be hereinafter discussed in greater detail, the 85 mw unit, on July 17, 1974, suffered an explosion which rendered the unit inoperable.

refusal to interconnect adversely affected Muny Light's ability to maintain and repair the 85 mw unit during the aforesaid period.[2] Warren Hinchee, for example, Muny Light's Commissioner for the period March, 1971 to October, 1973, testified that while MELP was in fact unable to "adequately maintain the 85-megawatt generator" during the year 1973, the securing of maintenance power over the permanent interconnection would have enabled Muny Light "to plan and execute maintenance" on the large unit and, moreover, operate the unit "in accordance with good utility practice". Transcript at pp. 11,464; 11,462–63; 11,465. Irv Daniels, Muny Light's Superintendent of Generation from 1973 until his retirement on April 1, 1976, similarly testified, though without specifically distinguishing between the 85 mw unit and the remainder of MELP's generating facilities, that the availability of maintenance power over the interconnection would have afforded Muny Light the opportunity to follow "a decent maintenance schedule" and thereby "save a lot of our equipment instead of driving it in the ground like we did." Transcript at pp. 12,917–18.

The foregoing testimony, while ostensibly supportive of the plaintiff's position herein, must be assessed in light of that evidence of record which bears upon the hereinbefore alluded to July 17, 1974 explosion, and the MELP response thereto. Such evidence consists primarily of Stipulation 132, which provides in its entirety as follows:

Muny Light's 85 mw unit was out of service for most of the first half of 1974. On July 17, 1974 this unit suffered an explosion. Both explosion-related repairs and non-explosion-related repairs were done to the 85 mw unit at a cost in excess

of $2 million with the intention of putting the unit back into service. The City determined not to complete the repairs and the unit has not operated since.

The substance of Stipulation 132 is supplemented to a limited extent by the testimony of Daniels, who estimated that the post-explosion repairs on the constituent elements of the 85 mw unit, namely, Boiler No. 6 and Turbine No. 11, were 65 per cent complete at the time of his retirement in April, 1976. Transcript at p. 12,916.[3]

It is important to note at this juncture that the City advances no claim in this litigation that the July 17th explosion was in any way attributable to the failure of the defendant to provide Muny Light with a permanent synchronous interconnection as of January, 1973. *See* plaintiff's Memorandum in Response to Court's Request for Information of September 14, 1981. Indeed, the principal architect of the City's damage claim, William R. Mayben, conceded in his testimony of August 27, 1981 that "[t]here was nothing in [his] mind" which would indicate that the instant explosion was causally related to "the lack of an interconnection". Transcript at p. 15,571.

It is equally important to observe that the evidence adduced during the plaintiff's case-in-chief proffers no explanation whatsoever for Muny Light's failure to restore the 85 mw unit to service in the aftermath of the explosion and the ensuing repairs. Indeed, the record does not so much as identify the individual or individuals responsible for MELP's decision to forego further repair and rehabilitation of the 85 mw unit, the time at which such decision was made, or the factors considered and relied upon by Muny Light to justify the abandonment of the large generating unit. Although it appears from the record that

---

2. The plaintiff's contention that the inability to obtain "back up" power precluded Muny Light from properly attending to its 85 mw unit is undermined to some extent by the fact the large unit was, notwithstanding the unavailability of maintenance power, nevertheless out of service in excess of 100 days during the calendar year 1973, and was operational in 1974 for only 72 days of the six and one-half month period immediately preceding the July 17, 1974 explosion. *See* PTX 2824; 2825.

3. It appears from the record that while Daniels was of the opinion that only 65 per cent of the total repairs necessary to return the 85 mw unit to service had been undertaken by April 1, 1976, he further believed that the repairs to Boiler No. 6 alone were, at this time, approximately 95 per cent complete.

Muny Light did, sometime in 1975, attempt to secure from Mayben and his colleagues an estimate of the costs which would be required to retrofit the 85 mw unit with the pollution control devices necessary to achieve compliance with the then existing environmental standards,[4] *see* transcript at p. 15,573, neither the testimony of Mayben nor that of any other witness presented by the plaintiff sheds any light upon this critical question of what facts and circumstances ultimately persuaded MELP to forego any further efforts to restore the 85 mw unit to service.[5]

It is, of course, firmly established that an antitrust plaintiff bears the burden of dem-

onstrating that the defendant's unlawful conduct proximately caused the injuries for which the plaintiff seeks recompense. The Sixth Circuit Court of Appeals recently had occasion to examine this requirement in the case of *Shreve Equipment Inc. v. Clay Equipment Corp.*, 650 F.2d 101, 105 (6th Cir. 1981), stating:

> A private plaintiff may not recover treble damages under § 4 of the Clayton Act, 15 U.S.C. § 15, by proving nothing more than a violation of the antitrust laws. *M. C. Manufacturing Co., Inc. v. Texas Foundries, Inc.*, 517 F.2d 1059, 1063 (5th Cir. 1975), *cert. den.*, 424 U.S. 968, 96 S.Ct. 1466, 47 L.Ed.2d 736 (1976); *Rea v. Ford Motor Co.*, 497 F.2d 577, 589 (3rd

---

4. A review of Mayben's July 10, 1981 report suggests that the expenditures required to retrofit Boiler No. 6 would have approximated $8,960,000. PTX 3041 at p. 15.

5. It is readily apparent from the record that Mayben did not, in the course of completing the 1975 retrofitting study or otherwise, undertake to investigate the circumstances which may have led to Muny Light's abandonment of the 85 mw unit. A review of Mayben's testimony, elicited on cross-examination, is instructive:

Q. The explosion in fact occurred in mid-1974, did it not?
A. I believe so, yes.
Q. And are you familiar with the repairs to that damage which were initiated by Muny Light?
A. No. I am not familiar with the actual work that went on.
Q. Are you familiar—withdraw that.
  You are familiar with the facts, are you not, that the work to repair the explosion did not begin until some six months after the explosion occurred?
A. I am not familiar with that precise date of the starting, no, sir.
Q. You do remember that it was substantially delayed after the occurrence?
A. Yes, I recall that.
Q. And are you aware of the course of that repair work as it actually occurred?
A. No, sir, not in any detail.
Q. You are aware, are you not, that the work proceeded from the time when it was started until early 1975, and do you have any knowledge as to how much money was expended on the repair work?
A. No, I don't.
Q. I beg your pardon?
A. No, I do not. I understood it was covered by insurance, so we did not attempt to show any cost associated with it.

Q. I appreciate that, but did you make any investigation of the costs actually incurred in making the repairs?
A. No, sir.
  *    *    *    *    *    *
Q. And it is a fact that nobody bothered to install any protection against steam leaking into the idle turbine, you know that to be the fact, do you not?
A. I have heard that, yes.
Q. And you know the fact to be that because of the exhaustion of the heating plant steam into the condenser of the turbine, that steam leaked into the turbine continually during the time from the time it shut down in mid-1974 for a substantial period of time, do you not?
A. I don't know what the path of the steam was to it. The one you have just described is a path it could have taken.
Q. In any event, Mr. Mayben, substantial damage was done to the turbine by steam leaking into it?
A. I do not know that.
Q. You don't know that.
  *    *    *    *    *    *
Q. And in point of fact, Mr. Mayben, the repair and rehabilitation of the large unit was abandoned because of the extent of the damage which had been allowed to occur to the turbine during this long interval following the explosion in 1974; you know that to be the fact, do you not?
A. I don't know those facts.
Q. Do you know some different facts?
A. No, I do not.
Q. You do not. All right.
Transcript at pp. 15,675–76; 15,680–82.
  Simply stated, Mayben does not appear to be familiar with the repairs actually undertaken on the 85 mw unit in the aftermath of the July 17, 1974 explosion, the cost of these repairs, or the factors which ultimately occasioned or contributed to Muny Light's abandonment of the large generating unit.

Cir.), *cert. den.*, 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974); *McAlpine v. AAMCO Automatic Transmissions, Inc.*, 461 F.Supp. 1232, 1264 (E.D.Mich.1978). "It is not enough that the public has been harmed by a violation of the antitrust laws" for a private plaintiff to recover treble damages. *Van Dyk Research Corp. v. Xerox Corp.*, 631 F.2d 251, 255 (3rd Cir. 1980). Nor does the fact that a plaintiff has suffered damage alone constitute liability under the antitrust laws. *Ace Beer Distributors, Inc. v. Kohn, Inc.*, 318 F.2d 283, 287 (6th Cir.) *cert. den.* 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963); *McAlpine, supra,* at 1264. To recover treble damages the plaintiff has the burden of proving a causal connection between the antitrust violation and the damages suffered. Various descriptions of this burden of proof require that the violation be a material cause of the injury, *Comfort Trane Air Conditioning v. Trane Co.*, 592 F.2d 1373, 1383 (5th Cir. 1979); or that the violation be a substantial factor in the occurrence of damage, *Commerce Tankers v. National Maritime Union of America*, 553 F.2d 793, 801 (2nd Cir.) *cert. den.*, 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977); *Reibert v. Atlantic Richfield Co.*, 471 F.2d 727, 731 (10th Cir.) *cert. den.*, 411 U.S. 938, 93 S.Ct. 1900, 36 L.Ed.2d 399 (1973); or that the violation be the proximate cause of the damage, *M. C. Manufacturing Co., supra,* at 1064, *McAlpine, supra.* Although a plaintiff need not show that the defendant's wrongful actions were the sole proximate cause of his injuries, the causal link must be proved as a matter of fact and with a fair degree of certainty. *Comfort Trane Air Conditioning, supra; Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d 1307, 1321 (5th Cir. 1976). "To be one of several causes is not enough." *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 997 (9th Cir. 1979) *cert. den.*, 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980). The evidence linking the violation to the injury sustained must be more precise than that needed to establish the amount of damages. *Van Dyk Research Corp., supra.*

Although the issue of causation is generally a question of fact for the jury, *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 702, 82 S.Ct. 1404, 1412, 8 L.Ed.2d 777 (1962), a trial court is required to "direct a verdict where the plaintiff has failed to present substantial evidence that defendant's illegal practices were a material cause" of the injury claimed. *Comfort Trane Air Conditioning v. Trane Co., supra* at 1383. In determining whether the plaintiff has adduced the requisite "substantial evidence" necessary to withstand a Rule 50(a) motion, the case authorities in this Circuit counsel that the trial court must, *inter alia*, view the plaintiff's proof in its most favorable light, and extend to said party the benefit of all reasonable inferences that can be drawn therefrom. As stated more fully by the Sixth Circuit Court of Appeals in *Morelock v. NCR Corp.*, 586 F.2d 1096, 1104–1105 (6th Cir. 1978), *cert. denied*, 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979):

> The issue raised by a motion for judgment n. o. v. is whether there is sufficient evidence to raise a question of fact for the jury. *O'Neill v. Kiledjian*, 511 F.2d 511, 513 (6th Cir. 1975). This determination is one of law to be made by the trial court in the first instance. *Id.* In determining whether the evidence is sufficient, the trial court may neither weigh the evidence, pass on the credibility of witnesses nor substitute its judgment for that of the jury. Rather, the evidence must be viewed in the light most favorable to the party against whom the motion is made, drawing from that evidence all reasonable inferences in his favor. *See Gillham v. Admiral Corp.*, 523 F.2d 102, 109 (6th Cir. 1975), *cert. denied*, 424 U.S. 913, 96 S.Ct. 1113, 47 L.Ed.2d 318 (1976). If, after thus viewing the evidence, the trial court is of the opinion that it points so strongly in favor of the movant that reasonable minds could not come to a different conclusion, then the motion should be granted. *Id.* at 109; *Reeves v. Power Tools, Inc.*, 474 F.2d 375, 380 (6th Cir. 1973); 9 Wright & Miller,

Federal Practice and Procedure § 2524 (1971).[6]

*Accord, Coffy v. Multi-County Narcotics Bureau*, 600 F.2d 570, 579 (6th Cir. 1979).

▇ It is readily apparent from the record that the City has failed to present any *direct* evidence which demonstrates that Muny Light's inability to perform maintenance on the 85 mw unit during the January, 1973–July, 1974 period played any role whatsoever in MELP's ensuing decision to forego further repair and rehabilitation of the large generating unit. As previously indicated, the record, as it is presently comprised, leaves entirely unexplained the facts and circumstances which were actually relied upon by MELP to justify the abandonment of the large unit. Indeed, the plaintiff's case-in-chief fails to identify, either by way of testimony or documentary evidence, the MELP personnel responsible for the decision to abandon the 85 mw unit or, more importantly, the factors which contributed to the decision which was ultimately reached.

The plaintiff nevertheless argues that it can be reasonably inferred from the substance of Stipulation 132 and the aforementioned testimony of Hinchee and Daniels that Muny Light's inability to properly attend to the 85 mw unit during the aforesaid period was in fact a material cause of MELP's wholly unexplained failure to restore the large unit to service. The Court, however, for the reasons which follow, is persuaded that the evidence heretofore adduced does not in fact provide a reasonable basis for inferring that CEI's assertedly anti-competitive conduct proximately resulted in the demise of the 85 mw unit. Indeed, it is the opinion of the Court that only resort to "[s]uspicion, conjecture and speculation"[7] would enable the factfinder to conclude, from the record as it is presently constituted, that the defendant's refusal to interconnect was in fact a material cause of MELP's subsequent decision to abandon the large generating unit.

▇ The City concedes in its September 15, 1981 memorandum that there has been "no evidence as to the precise nature of the damage to Boiler 6 resulting from the [July 17, 1974] explosion". *Id.* at p. 5. The plaintiff also appears to acknowledge that the record does not disclose the extent to which Boiler No. 6's state of disrepair—as measured immediately subsequent to the July 17th misfortune or thereafter—can be fairly attributed to the explosion alone or, alternatively, to causes for which the instant defendant may properly be held accountable.[8] The evidence of record similarly fails

---

**6.** The fact that the motion at bar is in the nature of a motion for a directed verdict, as opposed to the motion for a judgment n. o. v. specifically considered in *Morelock, supra*, is of no consequence here, as the case authorities have recognized that the applicable standards are the same for both procedural devices. *Warkentien v. Vondracek*, 633 F.2d 1, 6 (6th Cir. 1980); *Dulin v. Circle F Industries, Inc.*, 558 F.2d 456, 465 (8th Cir. 1977); *Yazzie v. Sullivent*, 561 F.2d 183, 188 (10th Cir. 1977); *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969); *Neville Chemical Co. v. Union Carbide*, 422 F.2d 1205, 1210 (3d Cir. 1970); 9 Wright and Miller, Federal Practice and Procedure § 2524 at 541–542 (1971).

**7.** *Miller v. New York Produce Exchange*, 550 F.2d 762, 767 (2d Cir.), *cert. denied*, 434 U.S. 823, 98 S.Ct. 68, 54 L.Ed.2d 80 (1977).

**8.** The plaintiff indeed asserts in its September 15th memorandum that evidence relating to (i) the condition of the 85 mw unit in the aftermath of the July, 1974 explosion; (ii) the repairs which were undertaken thereafter; and (iii) the ensuing failure of MELP to restore the unit to service is entirely "irrelevant" to this case. The basis of the plaintiff's assertion is its apparent belief that the trier of fact must, in assessing causation, focus not upon the events underlying this litigation as they actually transpired, but rather upon the events as they theoretically would have occurred, under the plaintiff's various hypotheses, absent the defendant's allegedly unlawful conduct.

It appears to the Court that the City's suggested approach is entirely inconsistent with the established principle which requires an antitrust plaintiff to demonstrate "*as a matter of fact* and with a fair degree of certainty" the existence of some causal connection between the unlawful conduct and the injury sustained. *Shreve Equipment Inc. v. Clay Equipment Corp., supra*, (emphasis supplied). That is to say, the Court remains of the view that proof of causation must be based upon facts "established by independent evidence properly introduced", together with those inferences which reasonably flow from such facts. *Logsdon v. Baker*, 517 F.2d 174, 175 (D.C.Cir.1975). *See Admiral Theatre Corp. v. Douglas Theatre Co.*, 585 F.2d 877 (8th Cir. 1978).

to identify, beyond Stipulation 132's vague and conclusory distinction between "explosion-related" and "non-explosion-related" repairs, the nature of those repairs which were actually performed on the 85 mw unit following the July, 1974 incident.

The failure of the City's case-in-chief to shed any light whatsoever upon the condition of the 85 mw unit in the aftermath of the explosion, or to identify with any specificity the nature of the repairs actually undertaken on the unit during this time, is not, of course, without consequence. Neither the Court nor the trier of fact is able to discern from the evidence, for example, whether or not the specific repairs assertedly necessitated by Muny Light's inability to secure maintenance power during the January, 1973–July, 1974 period were ultimately performed by MELP as a result of the $2,000,000 post-explosion expenditure referred to in Stipulation 132. That is to say, there is nothing in the record to demonstrate that any of the rehabilitative measures purportedly necessitated by the defendant's allegedly anticompetitive conduct remained unaccomplished at the time MELP finalized the decision to abandon the 85 mw unit.

Moreover, and perhaps more importantly, even if it were to be assumed that the disrepair properly attributable to MELP's inability to adequately maintain the large generating unit during the relevant period remained unremedied at or about the time Muny Light resolved to forego further rehabilitation of the unit, there is absolutely no evidence from which one could reasonably determine whether the disrepair attributable to the conduct of the defendant was, in light of the remaining sources of disrepair which are not so attributable, a substantial factor underlying MELP's abandonment of the 85 mw unit. As the Court has previously intimated, the evidence of record furnishes no basis whatsoever for comparing, in qualitative or in quantitative terms, the repair and rehabilitation necessitated by the defendant's allegedly anticompetitive conduct on the one hand and that necessitated by other causes—for which CEI cannot be held accountable—on the other hand. In the absence of any basis for

assessing and comparing the nature and extent of that repair and rehabilitation which is fairly attributable to the defendant's conduct with that which is attributable solely to facts and circumstances for which the CEI cannot be held responsible—which would appear to include, but are not necessarily limited to: (i) the July, 1974 explosion; and (ii) the requirement that MELP expend a considerable sum in retrofitting the large unit with the necessary pollution control devices, see infra, n.4, see also transcript at pp. 15,678–82;—the trier of fact can only speculate as to whether the former may be properly considered a material cause of Muny Light's ensuing decision to abandon all further rehabilitation and repair.

The City's suggestion that it can be properly inferred from the evidence that the instant defendant's unlawful conduct was a material cause of MELP's decision to abandon the 85 mw unit quite clearly runs afoul of the established principle which holds that reasonable inferences include only those "which may be drawn without resort to speculation." Hauser v. Equifax, Inc., 602 F.2d 811, 814 (8th Cir. 1978). Accord, Ralston Purina Co. v. Hobson, 554 F.2d 725, 729 (5th Cir. 1977); Carlson v. American Safety Equipment Corp., 528 F.2d 384, 386 (1st Cir. 1976); Business Development Corp. v. United States, 428 F.2d 451, 453 (4th Cir.), cert. denied, 400 U.S. 957, 91 S.Ct. 355, 27 L.Ed.2d 265 (1970). The plaintiff's contention would also appear to ignore the equally well-established principles enumerated by the Ninth Circuit Court of Appeals in Wolf v. Reynolds Electrical & Engineering Co., 304 F.2d 646, 649 (9th Cir. 1962) and reiterated in Neely v. St. Paul Fire & Marine Insurance Co., 584 F.2d 341, 345–46 (9th Cir. 1978):

> It is well settled that proof must be sufficient to raise a reasonable inference that the act or omission complained of was in fact the proximate cause of injury. The verdict of a jury cannot rest on guess or speculation. That defendant's [unlawful conduct] could possibly have been the cause is not sufficient. The same rule applies where, as here, the evidence

leaves the cause of an accident uncertain. The jury is not permitted to speculate in choosing one of the alternative possibilities, but is restricted to reasonable inferences based upon facts. (Citations and footnote omitted; emphasis in original)

To reiterate briefly, it is apparent from the record that the City has utterly failed to present any direct evidence which establishes that Muny Light's inability to perform maintenance on the 85 mw unit during the January, 1973–July, 1974 played any role whatsoever in MELP's subsequent decision to forego further repair and rehabilitation of the large generating unit. The instant record is similarly devoid of competent proof from which it can be inferred, without resort to "[s]uspicion, conjecture and speculation", *Miller v. New York Produce Exchange, supra,* that the defendant's assertedly anti-competitive conduct was in fact a substantial factor underlying MELP's abandonment of the 85 mw unit.[9] Under these circumstances, reasonable minds could only conclude that the plaintiff has failed to sustain its burden of adducing substantial evidence from which it can be reasonably determined, "as a matter of fact and with a fair degree of certainty", *Shreve Equipment Inc. v. Clay Equipment Corp., supra; accord, Terrell v. Household Goods Carriers' Bureau,* 494 F.2d 16, 20 (5th Cir.), *cert. denied,* 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974), that the defendant's conduct proximately resulted in that loss of generating capacity attributable to the demise of the large generating unit.

Accordingly, the motion of the defendant for a directed verdict pursuant to Rule 50(a), Fed.R.Civ.P., is meritorious and properly granted.

IT IS SO ORDERED.

## ON MOTION FOR RECONSIDERATION

By Memorandum and Order of September 24, 1981, 538 F.Supp. 1344, this Court resolved, pursuant to Rule 50(a), Fed.R. Civ.P., that the plaintiff City of Cleveland had failed to present sufficient evidence to support its contention that the defendant The Cleveland Electric Illuminating Company (CEI) proximately caused the loss of generating capacity attributable to the demise of the City's 85 mw generating unit. Thereafter, on September 29, 1981, the plaintiff moved for reconsideration of this tribunal's September 24th decree as well as certain of the Court's previous evidentiary rulings, arguing that the City would have adduced sufficient evidence to withstand the defendant's Rule 50(a) motion if the Court had not improperly excluded the testimony in question. Following a careful review of the proffered testimony cited in the plaintiff's supporting papers, the Court determined, by oral ruling of October 1, 1981, that a departure from its previous decrees was unwarranted, and, accordingly, denied the City's motion for reconsideration in its entirety. Transcript at pp. 18,394–97. The Court at that time further advised counsel that the reasoning underlying its determination would be expressed in somewhat greater detail in the instant written opinion.[1]

9. In contesting the defendant's motion, the plaintiff argues that the Court must consider not only those forces put into motion as a consequence of CEI's refusal to interconnect but also the cumulative effect of all the anti-competitive conduct here in issue. This Court is, of course, cognizant of the fact that the plaintiff is entitled to "the full benefit of [its] proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Continental Ore Co. v. Union Carbide & Carbon Corp., supra,* 370 U.S. at 699, 82 S.Ct. at 1410. Nevertheless, the record compels the conclusion that the evidentiary shortcomings heretofore described persist irrespective of whether causation is predicated upon the refusal to interconnect alone or, alternatively, upon the cumulative effect of all of the defendant's allegedly

unlawful activity. Under either mode of analysis, the cause or causes of the ultimate demise of Muny Light's 85 mw unit cannot be ascertained without resort to conjecture, speculation and surmise.

1. During the Court's preparation of the instant opinion, the trier of fact ascertained that the defendant had not violated Section 2 of the *Sherman Act,* and, accordingly, returned a verdict in favor of CEI. Although this verdict might appear to render the issue of whether the defendant may be held monetarily liable for the demise of Muny Light's 85 mw unit moot, the Court shall, in the interest of completing the trial record, and in accordance with its earlier representation, undertake to elaborate upon the oral ruling of October 1, 1981, as hereinafter follows.

As the Court indicated in its oral disposition of October 1, 1981, the motion at bar is essentially an attempt on the part of the City to predicate liability on and recover damages for conduct which either predates the relevant statutory period or which is immune from antitrust liability under the *Noerr-Pennington* doctrine. The Court would observe in addition that the City's current attempt to utilize previously excluded evidence to bolster its otherwise unsupported assertion that CEI's conduct proximately resulted in the permanent loss of MELP's 85 mw unit is, to a large extent, inconsistent with the representations of counsel which accompanied certain of City's proffers, which representations indicated, as appears more fully below, that much of the proffered testimony here in controversy was to be introduced solely on the issue of intent and, as such, was to have no bearing whatsoever on the question of damages.

█ In urging that the Court's evidentiary rulings precluded the City from adducing proof sufficient to overcome the defendant's Rule 50(a) motion, the plaintiff initially directs the Court's attention to the excluded testimony of James Meehan and Irv Daniels, both of whom were apparently prepared to opine, in effect, that the construction of a synchronous interconnection *prior to* the commencement of the relevant statutory period would have enabled Muny Light to better maintain the 85 mw generating unit. This proffered testimony was, of course, excluded by the Court on the grounds that the instant defendant could not, consistent with the four-year limitations period prescribed in 15 U.S.C. § 16(i), be made to answer in damages for acts or omissions transpiring prior to July 1, 1971. *See* transcript at pp. 12,837–57; 12,868–69; 12,909–10. Although the City's motion suggests that it is presently of the view that conduct undertaken prior to the relevant statutory period may properly serve as a predicate for a damage award, the Court remains persuaded that the plaintiff's attempt to hold CEI accountable for acts or omissions occurring prior to July 1, 1971 is quite clearly barred by the applicable statute of limitations.

The City further argues that its inability to withstand the defendant's Rule 50(a) motion was in part attributable to the Court's exclusion of certain testimony which was designed to illustrate the benefits which theoretically would have accrued to Muny Light in the event a 69 KV temporary intertie had been operational as of November, 1971. While the City currently insists that this proffered testimony bears upon the propriety of holding the defendant answerable in damages for the demise of the 85 mw unit, plaintiff's counsel, at the time the evidence was sought to be introduced, represented to the Court that the proposed testimony was of no relevance to the City's damage claim and, accordingly, offered the evidence solely on the issue of intent. A review of counsel's representation, upon which the Court relied in excluding the testimony, is instructive:

Q. Mr. Hinchee, supposing there had been by the middle of November, let's say, 1971, a 69 KV temporary intertie in operation between Muny Light and CEI, what differences would have occurred in Muny Light's operation that did not occur with the load transfer service?

MR. LANSDALE: I object, if your Honor please.... There is no claim for this, I object.

This is interjecting a new issue into the case and claiming a failure of using any interconnection in November of 1971, and the claim is January 1, 1973, and I object.

It's a brand-new issue, a brand-new claim, and he can't interject his mistakes.

MR. NORRIS: I disagree, your Honor.

I don't think it's a brand-new issue, because the evidence has shown that there has been a succession of refusals to interconnect, these refusals by CEI; and *the plaintiff is claiming damages based upon a refusal of CEI to agree to the 138 KV, and the damage calculation, of course, is based upon the 138 being operational as of January 1st, 1973. However, the plaintiff submits*

*that it is appropriate for this evidence to be put in because it goes to intent.*

Here is still another request for interconnection that the City made to CEI—that was refused—that could have been in operation by mid-November, 1971, as an interim 69 KV intertie during the time the 138 intertie would be constructed; and *CEI's refusal of that request, your Honor, I submit goes to intent,* and it is not objectionable.

Transcript at pp. 11,457–58 (emphasis supplied).

■ A similar and equally belated after-the-fact change of position on the part of the City underlies the plaintiff's current attempt to utilize the proffered testimony respecting the $9.8 million bond issue to support its otherwise unproven assertion that the defendant's unlawful conduct was a material cause of Muny Light's abandonment of the large generating unit. The record discloses, for example, that the plaintiff has, throughout the course of these proceedings, represented to the Court that evidence relating to the defendant's alleged efforts to interfere with the City's ability to obtain capital funds (*i.e.* the $9.8 million bond issue) as well as that pertaining to CEI's attempt to delay the construction of the 69 KV temporary intertie (*i.e.* the so-called "Miller Suit") was offered solely for the purpose of establishing the defendant's intent. *See* Brief of City of Cleveland in Support of Admissibility of Evidence Relating to Defendant's Efforts to Prevent MELP from Obtaining $9.8 Million of Capital Funds, October 3, 1980 at p.1 ("the City is not basing a claim for relief upon the efforts undertaken by CEI to prevent the City from obtaining vitally needed capital for MELP"); City's Supplemental Memorandum in Support of Admissibility of Evidence Relating to the Miller Suit and the $9.8 Million Bond Issue, August 3, 1981 at p.3 ("the City does *not* ground Sherman Act liability upon CEI's conduct with respect to the Miller Suit or the $9.8 million bond issue") (emphasis in original). *See also* Motion of the City of Cleveland for Reconsideration of this Court's Determination that the Miller Taxpayer Suit Constitutes CEI Protected Activity under the Noerr-Pennington Doctrine, July 6, 1981 at p.7, n.5; Brief of the City of Cleveland in Support of Admissibility of Evidence Relating to Defendant's Support of a Taxpayer Suit, September 18, 1980 at p.3.[2] Having concluded its case-in-chief, however, the plaintiff, for the first time in this litigation, dilatorily asserts that the efforts purportedly undertaken by CEI to impair the City's ability to raise capital constitute actionable conduct which, it can be inferred, contributed to the ultimate demise of MELP's 85 mw unit, and for which the defendant may be properly assessed money damages. It is abundantly clear from the record and the governing authorities that the City's current position not only flies in the face of its previous representations that the conduct in question was not, under the plaintiff's own theory of the case, a basis of liability, but, also and more fundamentally, totally ignores the established principle that antitrust liability cannot be predicated upon activity which is protected under *Noerr-Pennington.* That is

**2.** The City's repeated assurances that it did not seek to predicate liability or the recovery of damages upon the conduct undertaken by CEI in connection with either the $9.8 million bond issue or the Miller Suit ultimately persuaded the Court that the issue of whether such conduct was within the ambit of the "sham" exception to the *Noerr-Pennington* doctrine was one which was not properly joined in this case. *See* transcript at pp. 12,626–30. Accordingly, the Court assessed the propriety of admitting evidence respecting the $9.8 million bond issue and the Miller Suit by employing, in accordance with the applicable authorities, "a test that weighs the probativeness of and the plain-tiff's need for the evidence against the danger that admission of the evidence will prejudice the defendant's first amendment rights." *Feminist Women's Health Center v. Mohammad,* 586 F.2d 530, 543 n.7 (5th Cir. 1978), *cert. denied,* 444 U.S. 924, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979). In concluding that the weighing of interests favored exclusion of the proffered evidence, the Court, of course, relied in substantial part on its considered opinion that the probative value of the proof was significantly diminished by the defendant's admissions in this case. *See e.g.* transcript at pp. 1263–66. *See also* Memorandum and Order of September 13, 1980, 538 F.Supp. 1280.

to say, the plaintiff's belated attempt to utilize the proffered testimony respecting the $9.8 million bond issue in support of its contention that the defendant may be held accountable for the permanent loss of MELP's 85 mw unit does not appear to comport with the principle that evidence of activity protected under *Noerr-Pennington* may only be admitted for the limited purpose of demonstrating "the purpose and character of the particular transactions under scrutiny". *United Mine Workers of America v. Pennington*, 381 U.S. 657, 670 n.3, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626 (1965).

The Court, having carefully examined the remainder of the contentions advanced in the City's motion for reconsideration, finds them similarly devoid of merit. The Court is persuaded by its review of the record that the motion at bar represents an entirely improvident attempt on the part of the plaintiff to predicate liability upon clearly inadmissible evidence, much of which the City would now have the Court utilize for purposes fundamentally different from those for which the testimony in question was originally offered. Inasmuch as the instant motion relies upon properly excluded evidence, the bulk of which pertains to conduct which simply cannot serve as a basis of liability, the Court can only conclude that the City's motion for reconsideration is entirely without merit and properly denied.

IT IS SO ORDERED *nunc pro tunc* to October 1, 1981.